<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

---

CAREONE AT BIRCHWOOD, LLC,
*et al.*,

              Plaintiffs,

              v.

TOWNSHIP OF EDISON, *et al.*,

              Defendants.

---

Case No. 2:20-cv-07976 (BRM) (JSA)

**OPINION**

**MARTINOTTI, DISTRICT JUDGE**

      Before the Court are three motions. The first is Defendant Township of Edison Zoning Board of Adjustment's (the "Board") Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. (ECF No. 76; Mot. Br. (ECF No. 76-3).) Plaintiffs CareOne at Birchwood, LLC ("CareOne") and 1330 Inman Avenue, LLC (collectively "Plaintiffs") filed an opposition (ECF No. 76-10), and the Board filed a reply (ECF No. 76-12). The second is Defendant Township of Edison's (the "Township") (together with the Board, "Defendants") Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. (ECF No. 77; Mot. Br. (ECF No. 77-2).) Plaintiffs filed an opposition (ECF No. 77-9), and the Township filed a reply (ECF No. 77-17). The third is Plaintiffs' Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. (ECF No. 78, Mot. Br. (ECF No. 78-2).) The Township filed an opposition (ECF No. 78-28), the Board filed an opposition (ECF No. 78-31), and Plaintiffs filed a reply (ECF No. 78-33). Having reviewed the parties' submissions filed in connection with the Motions, and having declined to hold oral argument pursuant to Federal Rule of Civil Procedure 78(b), for the reasons set forth below and for good cause having been shown, the Board's Motion for Summary Judgment

(ECF No. 76) is **GRANTED IN PART and DENIED IN PART**, the Township's Motion for Summary Judgment (ECF No. 77) is **GRANTED IN PART and DENIED IN PART**, and Plaintiffs' Motion for Summary Judgment (ECF No. 78) is **GRANTED IN PART and DENIED IN PART**.

I.    BACKGROUND

A.    **Factual Background**

This is a housing discrimination matter involving Plaintiffs' allegations that Defendants unlawfully discriminated against the elderly, handicapped, and other disabled individuals ("Disabled Individuals"). (*See generally* ECF No. 20 (First Am. Compl.).) Plaintiffs allege that the Township's zoning regulations (the "Code" or "Zoning Ordinance") "preclude the development of assisted living, memory care, and other congregate care facilities within the Township" and specifically "within any of the Township's thirty-four zoning districts, including all residential districts." (*Id.* ¶¶ 1, 3.)

Plaintiffs seek to construct a 90,000 square foot, 3-story assisted living facility (the "Facility") on property located at 1330 Inman Avenue, Edison Township, New Jersey 08820 and identified as Block 410, Lots 27, 28, 30, 31 and 11.C of the Township's Tax Map (the "Property") which is located in one of the Township's residential zoning districts denoted as R-A (the "R-A District"). (ECF No. 76-2 (the Board's Statement of Material Facts ("SMF") in Supp. of Mot. for Summ. J.) ¶ 3; ECF No. 77-3 (the Township's SMF in Supp. of Mot. for Summ. J.) ¶¶ 26, 29; ECF No. 78-3 (Pls.' SMF in Supp. of Mot. for Summ. J.) ¶ 2.) The Property consists of 10.1 acres of land and the west side of the Property is adjacent to an existing nursing facility, CareOne at the Highlands, which is operated by Plaintiffs' affiliate and located in the residential R-BB district (the "R-BB District"). (ECF No. 78-3 ¶¶ 10–12; ECF No. 78-29 (the Township's Resp. to Pls.'

SMF) ¶¶ 10–12.) ECF No. 78-32 (the Board's Resp. to Pls.' SMF) ¶¶ 10–12.) The Plainfield Country Club is to the south of the Property. (ECF No. 78-3 ¶ 12; ECF No. 78-29 ¶ 12; ECF No. 78-32 ¶ 12.) There are a total of eight houses with their backyards facing the Property—four houses to the east of the Property and four houses to the north of the Facility. (ECF No. 78-3 ¶¶ 14–15; ECF No. 78-29 ¶¶ 14–15; ECF No. 78-32 ¶¶ 14–15.) An aerial map of the Property and the surrounding area is provided below.[1]



### 1.    The Township's Master Plan and the Master Plan Reexamination Report

The Township's master plan promulgated in 2003 (the "Master Plan") and the master plan reexamination report (the "Reexamination Report") issued in 2011 recognized the Township's growing elderly population. Both the Master Plan and Reexamination Report noted objectives to "[e]ncourage the development of creative senior housing options such as *assisted living*" and

---

[1] (Decl. of Joseph Straus in Supp. of Pls.' Mot. for Summ. J. ("Straus Decl.") Ex. A-1.)

"[a]mend the zoning ordinance where appropriate to permit by right a variety of senior housing options while maintaining a balanced community-wide density." (ECF No. 77-3 ¶¶ 15–17; 78-3 ¶¶ 25–28; ECF No. 78-32 ¶¶ 25–28.)

### 2.    The Zoning Ordinance

Section 37-11 of the Code provides the zoning requirements and regulations applicable to the R-A District. (ECF No. 77-3 ¶ 10; ECF No. 78-3 ¶ 3; ECF No. 78-32 ¶ 3.) Section 37-11.1, entitled "Permitted Uses," provides as follows:

> No building, structure or premises shall be used, and no building or structure shall be erected or structurally altered, except for the following uses:
>
> a.   A single-family detached house;
>
> b.   A church, synagogue or other place of worship, including parish house and school buildings, provided that the lot has a minimum area of three (3) acres and a width of two hundred (200) feet, and provided further that no accessory use shall be located within twenty-five (25) feet of a lot line;
>
> c.   A private, nonprofit school approved by the State of New Jersey, provided that said use is located on a lot of five (5) acres or more and has direct access to a street classified as other than a local access street in the Master Plan of Edison Township;
>
> d.   Private golf courses, provided that the lot has a minimum area of one hundred (100) acres and that no structure or parking area is located within one hundred (100) feet of a lot line.

(ECF No. 77-3 ¶ 10; ECF No. 78-3 ¶ 4; ECF No. 78-32 ¶ 4.)

Section 37-11.3 of the Code, entitled "Conditional Uses," provides: "Conditional uses shall be the same as the R-AA District [another residential district], except that planned residential development permitting single-family dwellings shall be subject to standards and requirements set forth in subsection 37-11.1a." (ECF No. 77-3 ¶ 11; ECF No. 78-3 ¶ 5; ECF No. 78-32 ¶ 5.) Under Section 37-10.3 of the Code, the R-AA District provides the following conditional uses:

4

Private membership recreation facility offering activities limited to swimming, tennis, racquetball and handball courts, but not to include commercial use such as banquet hall restaurants open to the general public, etc., provided that:

a.  The use is located on a lot of not less than five (5) acres in size;

b.  A planted buffer area of not less than twenty-five (25) feet in depth and fencing, or both, shall be required between all parking areas, picnic areas, playfields and buildings and the adjacent lot lines. This provision may be waived if natural topography, wetlands or other natural or man-made features adequately separate the above from adjoining residentially zoned land;

c.  No building shall be located within seventy-five (75) feet of any lot line nor have a total floor area of more than ten (10%) percent of the lot area, nor shall any building exceed two (2) stories or twenty-five (25) feet in height.

(ECF No. 77-3 ¶ 12; ECF No. 78-3 ¶ 6; ECF No. 78-32 ¶ 6.) Therefore, "assisted living facilities" are not a permitted or conditional use in the R-A District. (ECF No. 76-2 ¶ 2; ECF No. 77-3 ¶¶ 9–10; ECF No. 78-3 ¶ 7.) The Code states in Section 37-4.14(a) that "[a]ll uses not specifically permitted by zone or by State or Federal law are prohibited." (ECF No. 77-3 ¶ 13; ECF No. 78-3 ¶ 73; ECF No. 78-32 ¶ 73.)

Despite the objectives provided in the Master Plan and the Reexamination Report, the Code as written does not include "assisted living facilities" as a permitted or a conditional use in any of the Township's residential zones and/or in any of the Township's thirty-four zoning districts.[2] (ECF No. 78-3 ¶ 74; ECF No. 78-32 ¶ 74.)  However, "nursing home or similar health facility" is listed as a permitted use in the Educational-Institutional District (the "E-I District") under Section 37-39.1(b); and Section 37-39.1(c) permits an "[i]nstitution or home for children, the aged, the

---

[2] The Township denies this proffered fact (ECF No. 78-29 ¶ 74), but a review of the Code confirms that the terminology "assisted living facilities" is not listed as a permitted or a conditional use. (Straus Decl. Ex. N.)

indigent or the handicapped." (ECF No. 77-3 ¶ 14; ECF No. 77-10 (Pls.' Resp. to the Township's SMF) ¶ 14.) Further, "nursing homes" are listed as a conditional use in the L-R Residential District (the "L-R District") as well as two affordable housing districts, the AHOZ-3 and AHOZ-4 Districts. (ECF No. 77-3 3 ¶ 19; ECF No. 77-10 ¶ 19.)

### 3.   Plaintiffs' Application Before the Board

On or about November 28, 2018, the State of New Jersey issued Plaintiffs a Certificate of Need[3] "for the establishment of a 106-bed assisted living residence to be located at [the Property]" based in part on "the [lack of] availability of facilities or services which may serve as alternatives or substitutes" in the area around the Property.[4] (ECF No. 77-3 ¶ 23; ECF No. 78-3 ¶ 17.) In December 2018, Plaintiffs filed an application before the Board for preliminary and final site plan approval (the "Application") of the Facility. (ECF No. 76-2 ¶ 1; ECF No. 77-3 ¶ 22; ECF No. 78-3 ¶ 1.) The Application required multiple variances including certain bulk variances as well a use variance. (ECF No. 76-2 ¶ 3; ECF No. 77-3 ¶ 9; ECF No. 78-3 ¶ 8.) Plaintiff specifically sought the following variances: (a) 16.8% building coverage (the Code permits 15% building coverage); (b) 41.8% lot coverage (the Code permits 30% lot coverage); (c) 0.28% floor area ratio (the Code permits 0.25% floor area ratio); (d) a height of forty-seven (47) feet for the Facility (the Code permits a height of 40 feet); (e) the Facility would consist of three (3) stories (the Code permits 2.5 stories). (ECF No. 76-2 ¶ 3; ECF No. 76-9 (Pls.' Resp. to the Board's SMF) ¶ 3.)

---

[3] New Jersey statutory law provides that "[n]o health care facility shall be constructed or expanded, and no new health care service shall be instituted . . . except upon application for and receipt of a certificate of need." N.J. Stat. Ann. § 26:2H-7.

[4] The Township currently has three existing assisted living facilities, which have a total of 342 beds. (ECF No. 77-3 ¶ 6; ECF No. 78-3 ¶ 19.) On May 27, 2021, the Township memorialized a resolution adopting the approval of an overall redevelopment plan that included a fourth assisted living facility which will have "135 assisted living units" and did not require a use variance. (ECF No. 77-3 ¶ 7; ECF No. 77-10 ¶ 7.)

The Board conducted a series of public hearings on the Application. (ECF No. 76-2 ¶ 5; ECF No. 77-3 ¶ 25; ECF No. 78-3 ¶ 31.) Plaintiffs proposed the Facility would appear as follows:[5]

 

Plaintiffs presented testimony asserting that the Facility was designed to: (1) "be [financially] feasible" (Straus Decl., Ex. Q, the Board's May 12, 2020 Resolution (the "Resolution) ¶¶ 2, 15); (2) create "neighborhoods" that "foster[] socialization and interactions" within each "floor community" (*id.* ¶¶ 10–11); (3) be more "efficient" and "functional" for the residents by reducing walking (*id.* ¶ 23).[6] At the Board's hearing on June 18, 2019 (the "June 18, 2019 Hearing"), Hank Bignell ("Mr. Bignell"), the Township's Director of Planning and Engineering, and Donna Erem, Esq. ("Ms. Erem"), the attorney representing CareOne at the time, shared the following exchange:

> Mr. Bignell:   Is there any reason why we can't make the facility smaller? Does it have to be at this scale?
>
> Ms. Erem:   Yeah. You know —
>
> Mr. Bignell:   Is there a reason—a finan- —is there some kind of reason why it has to be ninety — an extra 106 beds?

---

[5] (Straus Decl. Exs. A-5, A-25.)

[6] Plaintiffs provided testimony that "[m]ost newer facilities of this nature are three to four stories as that meets the needs. One or two stories increases the walking distances for residents and staff and not as efficient or functional." (*Id.*)

7

> Ms. Erem:    I think that's a very good — that's a very good
> question, Mr. Bignell. 106 beds is the minimal
> number of beds that is deemed as a feasible facility.
> All right? We have in the — that was [court ordered]
> recently in —
>
> . . . .
>
> Ms. Erem:    In Paramus recently a building was [court ordered],
> 126 beds, that I presented. . . .

(Straus Decl., Ex. E, Tr. of the Board's June 18, 2019 Hearing ("June 18, 2019 Tr."), 78:14–79:23).

On the same date, Paul Phillips, AICP, PP ("Mr. Phillips"), a licensed professional planner,

testified on behalf of CareOne that:

> What we're seeing today is more and more new construction of
> assisted living facilities and specialized senior care facilities that are
> three stories in height. In some cases we're seeing four stories or
> greater, but typically we're seeing three stories in height. And,
> incidentally, I basically looked at the three existing facilities that I
> mentioned earlier that are located within the Township. Two of the
> three are three stories in height, one is two stories, and each of those
> — each of the three actually adjoins single-family homes at some
> point or another abutting that site. Not the complete sites but at some
> point or another they're adjacent [to] single-family homes.
>
> You also heard from our architect [that] the three-story height makes
> sense operationally. It keeps the — also keeps the building footprint
> contained within the overall site and it also, from an operational and
> functional standpoint, it limits the distances which residents, staff,
> and visitors must walk within a building. Which if you even try to
> go to one or two stories would be far too spread out in today's
> environment to meet the programmatic needs of these types of
> facilities.

(*Id.*, 51:10–52:8.) On December 17, 2019, the Board unanimously voted to deny the use and bulk

variance relief requested in the Application. (ECF No. 76-2 ¶ 6; ECF No. 78-3 ¶ 59.)

**4.    The Board's Resolution**

On May 12, 2020, the Board adopted the Resolution which memorialized the Board's

denial of the Application. (ECF No. 76-2 ¶ 6; ECF No. 77-3 ¶ 31; ECF No. 78-3 ¶ 60.) The

8

Resolution provided, in pertinent part, the following conclusions associated with the Board's denial:

1.      The Board concluded that [Plaintiffs] had failed to justify the relief for use and bulk variance sought pursuant to N.J.S.A. 40:55D-70. [Plaintiffs] had not demonstrated that the requested relief could be granted without substantial detriment to the zone plan, zoning ordinance, and the surrounding area. Although an otherwise inherent use, the Board determined that the Application raised several concerns regarding vehicular traffic, ingress, and egress to and from the property, noise intensification and height variances that were inconsistent with the Master Plan and zone plan thereby rending the proposed facility out of character for the site.

. . . .

4.      In denying the assisted living facility, the Board determined that the impact on the neighborhood far outweighed any benefits, taking into consideration that the . . . proposed facility would be considered an inherently beneficial use. The zone in which the facility is proposed is a single-family residential zone. The 3 story, 106-bed assisted living facility would be a significant detriment to the neighborhood and not suitable for the site. The project would create significant noise pollution from an on-site generator, garbage pick-ups, multiple daily deliveries, and additional traffic and daily operations, which for a facility of this size and scale would constitute a public detriment. The project's size and scale were likened to being akin to a mountain in someone's backyard. The structure would appear in excess of 60 feet in height at certain points due to varied grading. The ambitious landscaping proposed will not acceptably provide screening for at least ten years. It was therefore determined not a reasonable request to require neighbors to accept the landscaping as adequate. The screening from landscaping during winter months would also be insufficient based upon the loss of foliage. A reduction in height would have made this intensive proposal more agreeable and consistent with the neighborhood and more in line with the Township Master Plan. The site was found to not be particularly well suited for [Plaintiffs'] intended use, was found to be a detriment to the public good and public safety. [Plaintiffs] thereby failed to satisfy the negative and positive criteria.

9

(ECF No. 76-2 ¶ 36; ECF No. 77-3 ¶¶ 42–43.)

### 5.   Dr. Andrew A. Beveridge's Expert Report

Andrew A. Beveridge, Ph.D. ("Dr. Beveridge"), a Professor Emeritus of Sociology at Queens College and the Graduate Center of the City University of New York was retained by Plaintiffs to perform two analyses. (Straus Decl., Ex. J. Dr. Beveridge Expert Report ¶¶ 1, 6.) Dr. Beveridge concludes the Code "has a disproportionate effect on [Disabled Individuals] and households containing Disabled Individuals in the Township, including those suffering dementia or similar cognitive disabilities." (*Id.* ¶ 8.) Further, Dr. Beveridge calculates: (1) "Disabled Individuals within [the Township] are 34 times more likely to live within a group quarter setting than non-handicapped individuals of the same age"; and (2) "Disabled Individuals with a cognitive disability within Edison are 92 times more likely to live within a group quarter setting than non-handicapped individuals of the same age." (*Id.* ¶ 29.)

### B.   Procedural History

On June 30, 2020, Plaintiffs, on behalf of themselves and prospective residents, filed the original Complaint. (ECF No. 1.) On July 24, 2020, Plaintiffs filed a Motion for Preliminary Injunction. (ECF No. 9.) On July 27, 2020, the Court administratively terminated Plaintiffs' Motion for Preliminary Injunction and stayed the matter until the Third Circuit issued an opinion on an appeal of the Court's decision in a different matter which requested relief on a similar basis. (ECF No. 12.)

On January 14, 2021, Plaintiffs filed an Amended Complaint, on behalf of themselves and prospective residents, alleging five claims for relief: Disparate Impact on the Handicapped in Violation of the Fair Housing Amendments Act of 1988 (the "FHAA"), 42 U.S.C. § 3604(f)(2) (Count One); Failure to Provide Reasonable Accommodations in Violation of the FHAA, 42

U.S.C. § 3603(f)(3) (Count Two); Violation of Title II of the Americans with Disabilities Act ("Title II of the ADA"), 42 U.S.C. § 12101, *et seq.* (Count Three); Violation of the Rehabilitation Act of 1973, 29 U.S.C. § 791, *et seq.* (Count Four); Violation of Equal Protection Rights, 42 U.S.C. § 1983 (Count Five). (ECF No. 20.) Each of the five counts of the Amended Complaint requests that the Court permanently enjoin: "Defendants' enforcement of any provisions contained in the Code against Plaintiffs to the extent related to allowed land uses or dimensions in any review of Plaintiffs' request for approvals to develop, construct, and operate an assisted living and memory care facility on [the Property]"; and "Defendants from obstructing or interfering with Plaintiffs' construction and operation of the Facility[.]" (*Id.*)

On March 22, 2021, Defendants filed Answers to the Amended Complaint. (ECF Nos. 27, 28.) After extensive discovery and unsuccessful settlement efforts, the Parties filed a letter on March 10, 2023 which proposed a briefing schedule for summary judgment motions. (ECF No. 74.) On March 14, 2023, the Honorable Jessica S. Allen, U.S.M.J. entered a text order setting forth the parties' agreed upon proposed briefing schedule. (ECF No. 75.) "To preclude piecemeal extensions of briefing and adjournments" of the Motions' return dates, the parties were directed to refrain from filing any papers on the docket and instead serve moving, opposition, and reply papers to each other. (*Id.*) Once briefing was completed the parties were to file the papers simultaneously under three separate docket entries. (*Id.*)

On July 21, 2023, the Parties filed the complete briefing for each Motion. (ECF Nos. 76–78.) The Board's Motion for Summary Judgment is docketed as ECF No. 76 with the Brief in Support docketed as ECF No. 76-3, Plaintiffs' Opposition docketed as ECF No. 76-10,[7] and the

---

[7] Plaintiffs submitted the same brief in opposition to the Board and the Townships' Motions. Plaintiffs' Opposition was filed under two separate docket entries in relation to each of Defendants' Motions. (*See* ECF Nos. 76-10, 77-9.) Throughout this Opinion, the Court refers to

11

Board's Reply docketed as ECF No. 76-12. The Township's Motion for Summary Judgment is docketed as ECF No. 77 with the Brief in Support docketed as ECF No. 77-2, Plaintiffs' Opposition docketed as ECF No. 77-9, and the Township's Reply docketed as ECF No. 77-17. Plaintiffs' Motion for Summary Judgment is docketed as ECF No. 78 with the Brief in Support docketed as ECF No. 78-2, the Township's Opposition docketed as ECF No. 78-28, the Board's Opposition docketed as ECF No. 78-31, and Plaintiffs' Reply docketed as ECF No. 78-33.

### C.    Related Case

On June 30, 2020, the same date the original Complaint was filed in this matter, CareOne filed an Action in Lieu of Prerogative Writs (the "PW Action") against the Board in the Superior Court of New Jersey, Law Division, Middlesex County (the "Superior Court"). (Case No. MID-L-4382-20, Trans ID: LCV20201147348; ECF No. 77-3 ¶ 44; ECF No. 77-10 ¶ 44.) On January 8, 2021, the Superior Court entered a Consent Order voluntarily dismissing the PW Action without prejudice. (*Id.*, Trans ID: LCV202155905.) The Consent Order noted the Parties' agreement to voluntarily dismiss the PW Action pending the resolution of this matter. (*Id.*)

## II.   LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "On motions for summary judgment, the movant shall furnish a statement which sets forth material facts as to which there does not exist a genuine issue, in separately numbered paragraphs citing to the affidavits and other documents submitted in support of the motion." L. Civ. R. 56.1(a). A party asserting a genuine dispute of material fact must support the assertion by either "citing to

---

Plaintiffs' Opposition which was submitted as part of the motion packet for the Board's Motion for Summary Judgment. (ECF No. 76-10.)

particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). A factual dispute "is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and "is material only if it might affect the outcome of the suit under governing law." *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)). "Unsupported allegations, subjective beliefs, or argument alone, however, cannot forestall summary judgment." *Read v. Profeta*, 397 F. Supp. 3d 597, 625 (D.N.J. 2019) (citations omitted). Irrelevant or unnecessary factual disputes will also not preclude a grant of summary judgment. *See Anderson*, 477 U.S. at 248. Moreover, "mere speculation does not create genuine issues of material fact." *Dellapenna v. Tredyffrin/Easttown Sch. Dist.*, 449 F. App'x 209, 215–16 (3d Cir. 2011) (citing *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990)).

The party moving for summary judgment has the initial burden of showing the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once a movant adequately supports its summary judgment motion, the burden shifts to the nonmovant to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'"

*Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000) (quoting *Anderson*, 477 U.S. at 255). In other words, in deciding a party's summary judgment motion, the Court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 255. "Summary judgment is appropriate only when there are no genuine issues of material fact, drawing all justifiable inferences in favor of the nonmovant." *Adams v. Fayette Home Care & Hospice*, 452 F. App'x 137, 139 (3d Cir. 2011) (citing *Anderson,* 477 U.S. at 248, 255).

If the moving party bears the burden of proof at trial, summary judgment is not appropriate if the evidence is susceptible to different interpretations or inferences by the trier of fact. *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999). On the other hand, if the non-moving party bears the burden of proof at trial, "summary judgment is warranted if the nonmovant fails to 'make a showing sufficient to establish the existence of an element essential to [its] case.'" *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993) (alteration in original) (quoting *Celotex Corp.*, 477 U.S. at 322). A "genuine issue as to any material fact" cannot exist if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322–23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323. A material fact raises a "genuine" dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Borough of W. Chester*, 891 F.2d 458, 459 (3d Cir. 1989) (quoting *Anderson*, 477 U.S. at 248).

## III.   DECISION

The parties seek summary judgment in their respective favors on the five claims for relief of the Amended Complaint. (ECF Nos. 76–78.) The Court addresses each Count of the Amended Complaint in turn.

### A.   Disparate Impact on the Handicapped in Violation of the FHAA (Count One)

"'The Fair Housing Act . . . passed by Congress as Title VIII of the Civil Rights Act of 1968, prohibits housing discrimination on the basis of, *inter alia,* race, gender, and national origin'—and, following the adoption of the FHAA in 1988, individuals with disabilities." *431 E. Palisades Ave. Real Est., LLC v. City of Englewood*, 977 F.3d 277, 283 (3d Cir. 2020) (citing *Cmty. Servs., Inc. v. Wind Gap Mun. Auth.*, 421 F.3d 170, 176 (3d Cir. 2005)). Under the FHAA, it is unlawful:

> (2) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of—
>
> (A) that person; or
>
> (B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or
>
> (C) any person associated with that person.

42 U.S.C. § 3604(f)(2). The FHAA defines "handicap" as "a physical or mental impairment which substantially limits one or more of [a] person's major life activities." 42 U.S.C. § 3602(h)(1).[8]

---

[8] The parties do not dispute that the Facility's residents would be "handicapped" within the definition provided by the FHAA. Therefore, the Court does not address this issue. *See Hovsons, Inc. v. Twp. of Brick*, 89 F.3d 1096, 1103 n.3 (3d Cir. 1996); *see also Wagner v. Fair Acres Geriatric Ctr.,* 49 F.3d 1002, 1010 (3d Cir. 1995) ("Obviously, everyone that applies for admission to a nursing home does so because of his or her disabilities. Indeed, no one would be able to meet a nursing home's admission requirements in the absence of some handicapping condition necessitating nursing home care.").

"[C]ourts have specifically allowed claims under this section to be brought against municipalities and land use authorities." *Cmty. Servs.*, 421 F.3d at 176 (citing *Lapid-Laurel, L.L.C. v. Zoning Bd. of Adjustment of Twp. of Scotch Plains,* 284 F.3d 442 (3d Cir. 2002)). For alleging violations of the FHAA against municipal land use authorities, Plaintiffs generally bring three types of claims: "(1) intentional discrimination claims (also called disparate treatment claims) and (2) disparate impact claims, both of which arise under § 3604(f)(2), and (3) claims that a defendant refused to make 'reasonable accommodations,' which arise under § 3604(f)(3)(B)." *Id.* (citing *Lapid-Laurel*, 284 F.3d at 448 n.3).

"[P]roof of discriminatory intent" is not necessary to bring a claim under a disparate impact theory. *Lapid-Laurel*, 284 F.3d at 466 (citing *Doe v. City of Butler,* 892 F.2d 315, 323 (3d Cir. 1989). "When reviewing disparate impact claims brought under the FHAA, [the Third Circuit has] borrowed from the framework of Title VII disparate impact claims." *Id.* (citing *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 148 (3d Cir. 1977)). To establish a *prima facie* case of disparate impact, "the plaintiff must [first] show that the Township's action had a greater adverse impact on the protected group (in this case the elderly handicapped) than on others." *Id.* at 466–67 (citing *Rizzo*, 564 F.2d at 149). Next, "[i]f the plaintiffs succeed in demonstrating a *prima facie* case, then the burden shifts to the defendant to show that it had a legitimate, non-discriminatory reason for the action and that no less discriminatory alternatives were available." *Id.* at 467.

### 1.   Plaintiffs Have Met Their Burden of Establishing a Greater Adverse Impact

Plaintiffs assert the Code "expressly prohibits" assisted living facilities in the Township because assisted living facilities are not a conditional or permitted use in any of the Township's zoning districts. (ECF No. 78-2 at 33.) Plaintiffs submit the Code's "prohibition" on assisted living facilities therefore has a disparate impact on the elderly and disabled as it prevents necessary

16

housing and medical care. (*Id.* at 33–40.) Further, Plaintiffs contend the undisputed statistical evidence and Dr. Beveridge's conclusions demonstrate the elderly and disabled have been disproportionally affected by the Code. (*Id.* at 34–37.) Plaintiffs note Defendants have not challenged Dr. Beveridge's report.[9] (*Id.* at 37.)

The Township submits "[n]otably, the [Zoning] Ordinance at issue does not specifically mention the term assisted living, or congregate care facilities and therefore does not single out such a use; nor does it mention disabled or handicapped as the basis for not allowing such uses." (ECF No. 77-2 at 10.) The Township asserts: there are zones that allow *nursing homes* "by-right" and *nursing homes* are permitted as a "conditional use" in other zones; and Plaintiffs are not precluded from seeking a variance to build an assisted living or nursing home in any zone under New Jersey's Municipal Land Use Law. (*Id.* at 14.) The Township also contends Plaintiffs did not provide a statistical analysis that established disparate impact during the Application process. (ECF No. 78-28 at 10.) The Board "defers and adopts the Township's standards of review and arguments" as it relates to Plaintiffs' disparate impact claim. (ECF No. 76-3 at 6.) Additionally, the Board contends their actions have not resulted in a disparate impact upon a protected class. (*Id.* at 10–12.)

In support of their disparate impact claim, Plaintiffs are permitted to present materials from outside the administrative record before the Board including Dr. Beveridge. *See Lapid-Laurel*, 284 F.3d at 467 n.10 ("It makes sense that a plaintiff would need broader discovery and more latitude on the evidence that he or she is allowed to present in a disparate impact claim than in a failure to make reasonable accommodations claim. The first involves demonstrating a discriminatory pattern resulting from the impact of the municipality's decisions, whereas the latter turns only on

---

[9] Defendants do not dispute this argument. (*See* ECF Nos. 78-28, 78-31.)

information regarding the necessity and reasonableness of the proposed accommodation, all of which can be presented to a local land use board in the first instance."). Therefore, the Township's argument that Plaintiffs did not "provide some demographic information . . . that shows a disproportionate impact in a plausible way" during the Application process (ECF No. 78-28 at 10) is misplaced.

The Township places significant emphasis on the Third Circuit's decision in *431 E. Palisades Ave*. (*See* ECF No. 77-2 at 12–13; ECF No. 78-28 at 9.) Although the Township is correct in noting "[f]ailure to permit a land use as of right is not tantamount to an express prohibition," (ECF No. 77-2 at 12; ECF No. 78-28 at 9 (quoting *431 E. Palisades Ave.*, 977 F.3d at 286)), the Township appears to conflate the concept of disparate treatment with disparate impact. In *431 E. Palisades*, the Third Circuit analyzed a *disparate treatment* claim and addressed whether a city's zoning ordinance *facially discriminated* against individuals with disabilities. 977 F. 3d at 280–82. The city's zoning ordinance at issue did not list "assisted living facilities" as one of the permitted uses in the city's residential single-family districts but did explicitly allow "assisted living facilities" in a single district entitled "Research, Industrial, Medical." *Id.* The Third Circuit overturned this Court's decision which granted the developer's preliminary injunction based on the developer's theory that the city's zoning ordinance was facially discriminatory "with the practical effect" that the proposed assisted living facility would be considered a permitted use in the intended residential district. *Id.* The Third Circuit held the city's zoning ordinance did not discriminate on its face because, "[f]irst, assisted living facilities are not identified on the [subject] ordinance's face in the relevant [zoning] section, the proper scope of our inquiry. Second, even if considered, the [Research, Industrial, Medical] zone's allowance of assisted living facilities as of right does not render the ordinance facially discriminatory." *Id.* at 285. Here, Plaintiffs do not raise

18

a facial discriminatory treatment challenge, rather Plaintiffs raise an as-applied disparate impact challenge. Therefore, the Third Circuit's holdings in *431 E. Palisades Ave.* are not entirely applicable to the Court's decision.

"No single test controls in measuring disparate impact, but [Plaintiffs] must offer proof of disproportionate impact, measured in a plausible way." *Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mount Holly*, 658 F.3d 375, 382 (3d Cir. 2011) (citing *Hallmark Devs., Inc. v. Fulton Cnty.,* 466 F.3d 1276, 1286 (11th Cir. 2006)) (internal quotation marks omitted). Notably, "a disparate impact is [typically] demonstrated by statistics, and a *prima facie* case may be established where gross statistical disparities can be shown." *Id.* (internal citations and quotation marks omitted).

In *Lapid-Laurel*, a developer-plaintiff unsuccessfully sought approval from a zoning board of adjustment for a 95-bed assisted living facility. 284 F.3d at 445. The Third Circuit affirmed the district court's granting of summary judgment in favor of the township defendants on the developer-plaintiff's disparate impact claim because the developer-plaintiff did not present statistics demonstrating a disparate impact and merely relied on the fact that the township only designated one zoning district for "senior housing." *Id.* at 466–68. Unlike the developer-plaintiff in *Lapid-Laurel*, Plaintiffs have presented statistical evidence which at the very least sets forth a disparate impact. In his expert report, Dr. Beveridge provided various conclusions which demonstrates that the Code has a greater adverse impact on Disabled Individuals. *See Mt. Holly Gardens Citizens*, 658 F.3d at 383–84 (overturning the district court's dismissal of disparate impact claim because the district court "did not make the appropriate inferences" based upon the statistical analysis that "African–Americans would be 8 times more likely to be affected by the project than Whites, and Hispanics would be 11 times more likely to be affected"). Accordingly, the Court finds Plaintiffs

have satisfied their burden of establishing the Code has a greater adverse impact on Disabled Individuals.

### 2.     Defendants Have Not Met Their Burden of Showing that They Had a Legitimate, Non-Discriminatory Reason For Their Action

The Township asserts the Code serves the legitimate government interest of encouraging the most appropriate use of land and preserving the developed nature of the existing neighborhoods. (ECF No. 77-2 at 18.) The Township submits "[t]he proposed 90,000 square foot, three story facility would present a significant deviation from the Township's Zoning Code and would be a fundamental alteration of the R-A Zoning Plan as to permitted and conditional uses." (*Id.*) Additionally, the Township contends "[t]he Board's denial of Plaintiffs' application demonstrates the decision was aimed at preserving the character of the neighborhood . . . and was not based on the alleged protected status of the potential future residents." (*Id.*) In its reply brief, the Township reiterates there was a legitimate interest in protecting the residential character of neighborhoods surrounding the proposed assisted living facility. (ECF No. 78-28 at 13–15.) The Board asserts it had several non-discriminatory reasons to deny the Application. (ECF No. 76-3 at 12–14; ECF No. 78-31 at 17–18.)

Plaintiffs argue Defendants have not set forth a legitimate, non-discriminatory reason for denying the Application or for the Code's general prohibition on assisted living facilities. (ECF No. 78-2 at 37–40.) Plaintiffs assert the Board's justifications for denying the Application were pretextual and not supported by credible evidence. (*Id.* at 38.) As to the Code's general prohibition, Plaintiffs submit "for **two (2) decades** the Township has enforced hurdles on the elderly and handicapped (i.e., requiring 'use' variances in any district) that non-handicapped individuals do not face. There is simply no 'legitimate' justification for that." (*Id.* at 40) (emphasis in original). In their reply brief, Plaintiffs assert Defendants misinterpret Plaintiffs' disparate *impact* claim as

20

a disparate *treatment* claim, making Defendants' arguments completely misguided. (ECF No. 78-33 at 3.)

To the extent Defendants argue they had a non-discriminatory reason for denying the Application, the Court agrees with Plaintiffs and find these arguments are misplaced and irrelevant to Plaintiffs' disparate impact claim. As Plaintiffs note, they "are not contending Defendants intentionally **treated** Plaintiffs (or the Facility's future residents) in a discriminatory manner. Rather, Plaintiffs focus on the **impact** the Defendants' decisions (in particular, the Code's prohibition on assisted living facilities) has had on the elderly and disabled." (*Id.* at 4) (emphasis in original). Further, Plaintiffs assert the focus of their theory for recovery on their disparate impact claim is the Code's prohibition of assisted living facilities. (ECF No. 76-10 at 17 n.8.) Even assuming, *arguendo*, that the reasoning for the Board's denial of the Application was relevant to this issue, "[t]he test for whether the government has articulated a legitimate bona fide governmental interest that would support denying the application . . . is similar to the test of whether the defendant has demonstrated that the requested accommodation is 'unreasonable.'" *Lapid-Laurel*, 284 F.3d at 468. Therefore, the Court will address the reasoning of the Board's denial of the Application in its analysis of Plaintiffs' reasonable accommodations claim.

To satisfy their burden against a disparate impact claim, the defendant must "establish that 'no alternative course of action could be adopted that would enable that interest to be served with less discriminatory impact.'" *Mt. Holly Gardens Citizens*, 658 F.3d at 382 (quoting *Rizzo*, 564 F.2d at 149). The Court does not find the Township's primary argument—that the Code protects the character of zoning districts and neighborhoods—persuasive. *See Huntington Branch, N.A.A.C.P. v. Town of Huntington*, 844 F.2d 926, 937 (2d Cir. 1988) ("Though a town's interests in zoning requirements are substantial . . . they cannot, consistently with Title VIII, automatically outweigh

significant disparate effects.") (internal citations omitted).

The Court finds Defendants have not demonstrated that they had a legitimate, non-discriminatory reason for failing to list supportive housing for Disabled Individuals as a permitted use in any of the Township's residential districts. "[T]he FHAA 'is intended to prohibit the application of special requirements through land-use regulations . . . that have the effect of limiting the ability of such individuals *to live in the residence of their choice in the community.*'" *Hovsons*, 89 F.3d at 1105 (quoting H.R.Rep. No. 100–711, 100th Cong., 2d Sess. 13, *reprinted in 1988*, U.S.Code Cong. & Admin. News 2173, 2179) (emphasis in original). "The imposition of requirements which make it more difficult for the disabled to live *where they choose* is discriminatory." *Sunrise Dev., Inc. v. Town of Huntington, New York*, 62 F. Supp. 2d 762, 762 (E.D.N.Y. 1999) (citing *Stewart B. McKinney Found. v. Town Plan and Zoning Comm'n*, 790 F. Supp. 1197, 1209 (D. Conn. 1992)). Based on the foregoing, the Court finds that summary judgment in favor of Plaintiffs on their disparate impact claim (Count One) is warranted because the Code favors certain types of residential accommodations, such as single-family homes, over accommodations for Disabled Individuals which are effectively characterized as a "non-residential" use.[10] Able-bodied persons can freely choose to

---

[10] A finding of disparate impact solely premised on the Code's failure to list "assisted living facilities" as a conditional or permitted use in any of the Township's residential districts would not be a fair portrayal of the actual legislative landscape. The distinction between a "nursing home" and "assisted living facility" may very well be insignificant. *See* N.J. Admin. Code § 8:36-1.3 (defining "assisted living" as "a coordinated array of supportive personal and health services, available 24 hours per day, to resident who have been assessed to need these services including persons who require nursing home level of care" and defining "[a]ssisted living residence" as "a facility . . . which is licensed to provide apartment-style housing and congregating dining and to assure that assisted living services are available when needed, for four or more adult persons unrelated to the proprietor"). Further, the Code provides that: (1) "nursing home or similar health facility" and "[i]nstitution or home for children, the aged, the indigent or the handicapped" are listed as a permitted use in the E-I District (ECF No. 77-3 ¶ 14; ECF No. 77-10 ¶ 14); and (2) "nursing homes" are listed as a conditional use in the L-R District and two affordable housing districts (ECF No. 77-3 3 ¶ 19; ECF No. 77-10 ¶ 19). Regardless, the fact remains that "nursing homes" like "assisted living facilities" are not listed as a permitted use in any of the Township's

live in residential districts, whereas Disabled Individuals are excluded from maintaining supportive housing in those same districts preventing Disabled Individuals from living where they choose in the Township. Accordingly, Plaintiff's Motion seeking summary judgment on Count One is **GRANTED**, Defendants' Motions seeking summary judgment on Count One are **DENIED**. The Court finds the Code is discriminatory in violation of the FHAA to the extent it precludes development of assisted living facilities and other types of supportive housing in the Township's residential districts.

However, in the following section, the Court finds issues of material fact remain as to Count Two. *See* Section III.B. Therefore, the Court does not find a basis to grant Plaintiffs' sweeping requested relief, as this would have the practical effect of forcing the Township to permit the construction of the Facility. *See Hovsons*, 89 F.3d at 1103–06 (finding township-defendants failed to reasonably accommodate developer-plaintiff, enjoining the Township "from interfering with the construction of the nursing home facility", but not "reach[ing] the issue of whether [developer-plaintiff] established a claim of disparate impact" because of the reasonable accommodations holding).

## B.    Failure to Provide Reasonable Accommodations in Violation of the FHAA (Count Two)

In reviewing proposals for housing for the disabled and handicapped, local land use boards are required to make "reasonable accommodations in rules, policies, [and] practices." *Lapid-Laurel*, 284 F.3d at 449 (citing 42 U.S.C. § 3604(f)). Section 3604(f)(3)(B) defines discrimination to include "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). "The FHAA's 'reasonable accommodations' provision prohibits the enforcement of 'zoning ordinances and local housing policies in a manner

_____

residential districts and "nursing homes" are listed as a conditional use in only one residential district (the L-R District).

23

that denies people with disabilities access to housing on par with that of those who are not disabled.'" *Hovsons*, 89 F.3d at 1104 (citing Laurie C. Malkin, *Troubles at the Doorstep: The Fair Housing Amendments Act of 1988 and Group Homes for Recovering Substance Abusers,* 144 U. Pa. L.Rev. 757, 804 (1995)). "Pursuant to § 3604(f)(3)(B), the Township [defendant] has 'an affirmative duty' to make reasonable accommodations on behalf of handicapped persons." *Id.* (citing *United States v. Cal. Mobile Home Park Mgmt. Co.,* 29 F.3d 1413, 1416 (9th Cir.1994)).

Reasonable accommodations claims also employ "a burden-shifting analysis in which the initial burden is on the plaintiff to demonstrate that the accommodations that it requested are 'necessary to afford [handicapped] person[s] [an] equal opportunity to use and enjoy a dwelling.'" *Lapid-Laurel*, 284 F.3d at 459 (citing 42 U.S.C. § 3604(f)(3)(B)). If Plaintiffs satisfy their initial burden, then "the burden shifts to [Defendants] to show that the requested accommodations are unreasonable." *Id.* "The reasonable accommodation inquiry is highly fact-specific, requiring a case-by-case determination." *Hovsons*, 89 F.3d at 1104 (quoting *Cal. Mobile Home Park Mgmt. Co.*, 29 F.3d 1413, 1418 (9th Cir. 1994)).

### 1. Plaintiffs Have Not Met Their Burden of Demonstrating That the Accommodations Are Necessary for an Equal Opportunity[11]

Plaintiffs contend they have met their initial burden of establishing a claim for failure to

---

[11] In its analysis of Plaintiffs' reasonable accommodations claim, the Court only considers materials that were presented to the Board in its review of the Application. *See Lapid-Laurel*, 284 F.3d at 451 ("We join the Tenth and Fourth Circuits in holding that courts hearing reasonable accommodations challenges should ordinarily limit their review to the administrative record. This rule permits local land use boards to have the initial opportunity to provide reasonable accommodations to facilitate housing for the handicapped; it also comports with the tradition in American law that land use decisions are quintessentially local in nature. . . . Notwithstanding the foregoing, we point out that it may be necessary for a court reviewing an FHAA reasonable accommodations claim to look outside of the administrative record when a land use board either intentionally or inadvertently prevents an applicant from presenting the evidence necessary to support an FHAA reasonable accommodations claim.")

provide reasonable accommodations because the Facility and the requested variances were needed to satisfy feasibility and therapeutic purposes aimed at affording the elderly and disabled an equal opportunity to housing. (ECF No. 78-2 at 16–20.) Plaintiffs assert "the Board accepted, without objection, that the size and scope of [the] Facility was 'required to be financially feasible'" therefore Defendants cannot dispute feasibility at this stage because it was not contested when the Application was presented. (*Id.* at 17; ECF No. 78-33 at 8–9.) Plaintiffs also submit that no evidence or testimony was presented by the Board or any objectors that refuted the therapeutic reasons for the size and scope of the Facility.[12] (ECF No. 78-2 at 17.) Plaintiffs argue "all of the variances sought were aimed at a stated objective—to provide housing to the elderly and disabled that was (and remains) severely lacking in the Township." (*Id.* at 18.) Plaintiffs assert the Board's comments during the hearings, the Certificate of Need, as well as the Master Plan and Reexamination Report all demonstrate the necessity of the Facility. (*Id.* at 20.)

The Township contends the analysis for a claim for failure to provide reasonable accommodation is the same analysis for a claim of disparate impact. (ECF No. 77-2 at 21.) The Township submits Plaintiffs' claim asserted against the Township fails because the Township cannot substitute its own judgment for that of the Board or exercise zoning powers which are

---

[12] In response, Defendants argue Plaintiffs misunderstand the Board's role as a quasi-judicial body because the Board is not required to refute evidence or present rebuttal evidence, rather, the Board acts as a finder of fact. (ECF No. 76-12 at 3, 7; ECF No. 77-17 at 2; ECF No. 78-28 at 18–19; ECF No. 78-31 at 2, 4–6.) The Court agrees with Defendants. The Court finds Plaintiffs' arguments are misguided: (1) the Board was not required to present rebuttal evidence; and (2) the Resolution merely summarizes the testimony presented, it does not act as the Board's adoption of the contents of the testimony. *See Dolan v. De Capua*, 109 A.2d 615, 621 (N.J. 1954) (holding hearings and determinations before a zoning board of adjustment are quasi-judicial proceedings); *see also* N.J. Stat. Ann. § 40:55D-10 (requiring local zoning boards to hold hearings for variance applications during which testimony is given under oath, and produce written resolutions that contain findings of fact and legal conclusions based on these hearings).

reserved to the Board. (*Id.*; ECF No. 78-28 at 23.) The Township argues "[t]he appropriate mechanism to appeal the Board's decision, should Plaintiffs believe it was arbitrary, capricious or unreasonable, is in an action in lieu of prerogative writ" which Plaintiffs filed but voluntarily dismissed by consent order.[13] (ECF No. 77-2 at 22; ECF No. 78-28 at 26.) Additionally, the Township asserts Plaintiffs did not demonstrate the size of the Facility was necessary for financial viability or for a therapeutic purpose. (ECF No. 78-28 at 17–22.) The Township argues Plaintiffs' experts conclusively asserted that 106 beds were required for the Facility to be feasible without producing additional evidence. (*Id.* at 20.) Similarly, the Township contends Plaintiffs provided conclusory testimony as to why three stories serve a therapeutic purpose. (*Id.* at 21–22.) The Township submits the issuance of a Certificate of Need is immaterial to the analysis of whether the Facility is necessary to provide an equal opportunity. (*Id.* at 22; ECF No. 77-2 at 20.)

---

[13] New Jersey's Municipal Land Use Law ("MLUL") grants the governing body of each municipality the power to "adopt or amend a zoning ordinance." N.J. Stat. Ann. § 40:55D-62(a). However, the Township, as the governing body, may not exercise the powers of those expressly reserved to planning and zoning boards via the MLUL. *See* N.J. Stat. Ann. 40:55D-20 ("Any power expressly authorized by this act to be exercised by (1) planning board or (2) board of adjustment shall not be exercised by any other body, except as otherwise provided in this act."). The Court recognizes the Township's assertions that: "[b]ecause the Township has adopted a zoning ordinance and has granted authority over variance applications to the Zoning Board, the [Township] may not interfere with or influence the [Board]'s Decision"; "the [Township] has no power to review the Zoning Board's Decision denying the Plaintiffs' project"; and "so long as the [B]oard acts within its authority, the governing body has no standing to challenge the [B]oard's actions." (ECF No. 77-2 at 21–22; ECF No. 78-28 at 25.) The Court has already found that the Township's Code violates the FHAA, Section III.A, *supra*, therefore the fact that the Board had to consider a variance request for the Facility was due to the Township's enactment of a Code with a disparate impact. Accordingly, the Court finds Plaintiffs' arguments (ECF No. 76-10 at 30–31), persuasive. *See Ass'n for Advancement of the Mentally Handicapped, Inc. v. City of Elizabeth*, 876 F. Supp. 614, 625 (D.N.J. 1994) ("MLUL is invalid under the FHAA, to the extent that it permits municipalities to adopt zoning ordinances which would violate the FHAA."); *see also Holmdel Builders Ass'n v. Twp. of Holmdel*, 583 A.2d 277, 285 (N.J. 1990) (holding the Fair Housing Act "is to be construed *in pari materia* with the MLUL"); *Erlenbaugh v. United States*, 409 U.S. 239, 243–44 (1972) (explaining the rule of *in pari materia* "is a reflection of practical experience in the interpretation of statutes" thus when statutes have overlapping sections they "should be construed together").

The Board asserts Plaintiffs did not present evidence to the Board that a 3-story structure was necessary or "that a smaller structure would not have been able to service the need of memory impaired individuals." (ECF No. 76-3 at 17.) Additionally, the Board argues "no quantification, studies or objective information was presented to the Board to support" the assertion that the Facility was "a necessary design to foster communities, reduce ambulation for its residents and . . . be therapeutic." (ECF No. 78-31 at 16–17.)

"[T]he plaintiff in an FHAA reasonable accommodations case must establish a nexus between the accommodations that he or she is requesting, and their necessity for providing handicapped individuals an 'equal opportunity' to use and enjoy housing." *Lapid-Laurel*, 284 F.3d at 459. "Necessary means required. It is a high standard." *Vorchheimer v. Philadelphian Owners Ass'n*, 903 F.3d 100, 105 (3d Cir. 2018) (internal quotation marks omitted). Under the FHAA, "[f]or a housing accommodation to be 'necessary' . . . it must be required . . . to achieve [the] equal housing opportunity, taking into account the alternatives." *Id.* at 103.

Turning to the meaning of "equal opportunity," the Third Circuit has cited to the Sixth Circuit's holding which provides that under the FHAA "equal opportunity" is defined as giving "handicapped individuals the right to choose to live in single-family neighborhoods, for that right serves to end the exclusion of handicapped individuals from the American mainstream." *Lapid-Laurel*, 284 F.3d at 459 (quoting *Smith & Lee Assocs., Inc. v. City of Taylor,* 102 F.3d 781, 794–95 (6th Cir. 1996)); *see also Bryant Woods Inn, Inc. v. Howard County,* 911 F. Supp. 918, 946 (D. Md. 1996) ("[T]he Act prohibits local governments from applying land use regulations in a manner that will exclude people with disabilities entirely from zoning neighborhoods, particularly residential neighborhoods, or that will give disabled people less opportunity to live in certain neighborhoods than people without disabilities."), *aff'd* 124 F.3d 597 (4th Cir. 1997).

The Court finds Plaintiffs have sufficiently demonstrated that the requested use variance was necessary for Disabled Individuals to have an equal opportunity to live in a residential zoning district of the Township. *See Lapid-Laurel*, 284 F.3d at 460 ("With respect to the use variance, it is clear that [the developer-plaintiff] demonstrated that a use variance was necessary to achieve an equal opportunity for the elderly handicapped to live in a residential area of [the subject township]. This is true almost by definition. The elderly handicapped who need skilled nursing care usually are not able to live in their own houses. They must live in some sort of institutional setting in order to receive the assistance or health care that they need. No institutional health care facilities are permitted without a use variance in the neighborhoods zoned R–1 residential in [the subject township]. Therefore, a use variance is necessary for the elderly handicapped to have an equal opportunity to live in a residential area of [the subject township].") However, the analysis does not stop there, as the Third Circuit has applied a strict interpretation of the "necessity" requirement. *See id.* at 461 ("A strict interpretation of the 'necessity' requirements of § 3604(f)(3)(B) . . . require[s] [the developer-plaintiff to show that a building of the size that it proposed is required to provide the handicapped an equal opportunity to live in a residential neighborhood."); *see also Vorchheimer*, 903 F.3d at 109–10 (confirming the Third Circuit's strict interpretation of "necessary" in § 3604(f)(3)(B)).

In the zoning and variance context, the developer-plaintiff also has "to show that the size of its proposed [f]acility is required to make it financially viable or medically effective." *Lapid-Laurel*, 284 F.3d at 461. Specifically, the developer-plaintiff must demonstrate "the size of the proposed facility either would be necessary for the facility's financial viability (and therefore necessary to give the handicapped an equal opportunity to live in a residential neighborhood) or would serve a therapeutic purpose, (and would therefore be necessary to ameliorate an effect of

the handicap)." *Id.* (internal citations omitted). "To establish necessity based on either therapeutic purpose or financial viability, it is not sufficient to show that a home with more residents or units is generally beneficial or more economical to run. An applicant must produce evidence showing why the number of units requested is necessary." *Yates Real Est., Inc. v. Plainfield Zoning Bd. of Adjustment*, 404 F. Supp. 3d 889, 919 (D.N.J. 2019) (internal citations omitted).

Here, Ms. Erem did not conclusively testify as to why 106 beds were required to make the Facility financially viable. (*See* June 18, 2019 Tr. 78:14–79:23.) Further, Mr. Phillips did not specify that a facility with less beds and therefore less stories would be medically ineffective. (*See id.* 51:10–52:8.) Therefore, the Court finds Plaintiffs have not satisfied their burden and there is an issue of material fact as to whether the size and number of units of the Facility are required to make the Facility financially viable or medically effective.[14] *See Lapid-Laurel*, 284 F.3d at 461 (finding developer-plaintiff did not establish necessity despite presenting evidence on the therapeutic value of the proposed assisted living facility including a gerontologist's testimony "that assisted living facilities . . . that contained between 80 and 100 beds 'seem to work very well,'" because the gerontologist did not specify "that care facilities for the elderly that are smaller than the proposed facility are unable to provide the range of care required or that it would be economically infeasible to operate a smaller facility"); *see also Bryant Woods Inn,* 124 F.3d at 605 ("While 'some minimum size may be essential to the success' of group homes . . . the [developer-

---

[14] The Court recognizes that the Township and the surrounding area has a need for assisted living facilities as evidenced by the Certificate of Need, but this does not conclusively satisfy Plaintiffs' burden. *See Lapid-Laurel*, 284 F.3d at 461 n.8 ("Even assuming that [the developer-plaintiff] is correct that the [Certificate of Need] represents the State of New Jersey's conclusion that Union County is in need of additional assisted living and skilled nursing facilities, that alone does not establish a nexus between the requested accommodations and their necessity to create an equal opportunity for the handicapped.").

plaintiff] has introduced no evidence that group homes are financially viable with eight residents. . . . [Developer-plaintiff] has also presented no evidence in this case that expansion from 8 to 15 residents would be therapeutically meaningful. Thus, nothing in the record that we can find suggests that a group home of 15 residents, as opposed to one of 8, is necessary to accommodate individuals with handicaps."). Accordingly, Plaintiffs' Motion seeking summary judgment on Count Two is **DENIED**.

### 2. Defendants Have Not Demonstrated That the Requested Accommodations Were Unreasonable[15]

The Board asserts its reasons for denial of the Application are "non-discriminatory in nature." (ECF No. 76-3 at 15.) The Board contends the zoning for the Project was not "conducive to [a] 106-bed, 3 story structure generating noise, traffic, intensification of use resulting from lot development[,] and [is] out of character for the zone plan and Master Plan." (*Id.*) The Board further argues "there could be nothing reasonable about a structure that fails to synthesize the appearance of a neighborhood with a structure that at some points exceeds 60 feet in height from a visual perspective and which the Board's Planner indicated would be mansion-like in comparison to the

---

[15] Because the Court has found there is an issue of material fact as to whether Plaintiffs have satisfied their burden of showing the Facility is necessary, there is basis for the Court to deny Defendants' motions seeking summary judgment on Count Two. *See McKivitz v. Twp. of Stowe*, 769 F. Supp. 2d 803, 827 (W.D. Pa. 2010) (granting township-defendants' motion for summary judgment, finding homeowner-plaintiffs who sought a variance to use their property as a group home for recovering alcoholics and drug addicts did not satisfy their burden under the reasonable accommodation analysis, and noting "[b]ecause the Plaintiffs have failed to satisfy their initial burden of showing that 'reasonable accommodations' are necessary to provide handicapped individuals with an 'equal opportunity to use and enjoy a dwelling,' the burden of demonstrating that the requested accommodations are "unreasonable" does not shift to the Defendants") (citing 42 U.S.C. § 3604(f)(3)(B); *Lapid–Laurel, L.L.C.*, 284 F.3d at 459). Notwithstanding this potential basis, the Court will address the parties' arguments related to Defendants' burden of demonstrating that the requested accommodations were unreasonable. *See Yates Real Est.*, 404 F. Supp. 3d at 927–28 (considering the reasonableness of city-defendants' denial despite finding developer-plaintiffs had not satisfied their initial burden).

residential homes." (ECF No. 78-31 at 16.)

The Township contends the record demonstrates the Board's denial was based on legitimate land use concerns and does not amount to discrimination. (ECF No. 77-2 at 23.) The Township also argues the testimony presented to the Board during the public hearings "indicate[s] the Plaintiffs['] proposed [P]roject would not be effectively screened by trees for nearly a decade, the scale of the project was over 60 feet tall to some of the surrounding homes based on the grade of the property in addition to attendant noise concerns raised during the hearings." (ECF No. 77-17 at 4.)

Plaintiffs assert Defendants have not met their burden of showing that the requested accommodation, the Project, was unreasonable. (ECF No. 76-10 at 23–29; ECF No. 78-2 at 20–33; ECF No. 78-33 at 10–13.) Plaintiffs submit there is no evidence in the record which demonstrates that the Facility's operations would cause an "undue hardship" on the Township. (ECF No. 78-2 at 22–25.) Plaintiffs contend the Zoning Board's reasoning for its denial of the Application is pretextual because the Facility would not create unreasonable noise or traffic. (*Id.*; ECF No. 76-10 at 25–26.) Plaintiffs argue Defendants' claim that that the Facility is "out of character" with the neighborhood does not amount to a fundamental alteration of the zoning scheme as required to justify the denial of the Application. (ECF No. 76-10 at 26–29; ECF No. 78-2 at 25–33; ECF No. 78-33 at 11–12.) Plaintiffs assert the Zoning Board's finding, that the Facility was "inconsistent" with the neighborhood because there are multiple single-family residences nearby, was erroneous as a matter of law. (ECF No. 78-2 at 27–28.) Plaintiffs submit the Zoning Board's "comments and conclusions [as to the Facility's effect on the character of the neighborhood] are exactly the 'not-in-my-backyard' platitudes that are not permitted by the FHA." (*Id.* at 31.) Plaintiffs contend: "[t]he [Zoning] Board focused on 'inconveniences' and sentiments

of what a primarily 'single-family' residential neighborhood should look like, rather than accommodate the individuals who need that type of facility. Accepting the [Zoning] Board's findings necessarily would prevent assisted living facilities from every single residential zone in the Township." (*Id.* at 32.)

The Third Circuit has noted it "review[s] the reasonable accommodations requirement in light of two countervailing legislative concerns: (1) effectuation of the statute's objectives of assisting the handicapped; and (2) the need to impose reasonable boundaries in accomplishing this purpose." *Lapid-Laurel*, 284 F.3d at 462 (internal citations and quotation marks omitted). Ultimately, the Court must decide "whether, taking the evidence in the light most favorable to [Plaintiffs], there remains a genuine dispute as to whether there was sufficient evidence before the Board that [Plaintiffs'] requested accommodations (i.e., the variance and site plan applications for the proposed Facility) were unreasonable." *Id.* A municipality establishes that the requested accommodations are unreasonable in zoning cases by "prov[ing] that it could not have granted the variance without: (1) imposing undue financial and administrative burdens; (2) imposing an undue hardship upon the Township; or (3) requiring a fundamental alteration in the nature of the [zoning] program." *Id.* (quoting *Hovsons*, 89 F.3d at 1104). A fundamental alteration occurs when a "proposed use [is] incompatible with surrounding land uses." *Schwarz v. City of Treasure Island*, 544 F.3d 1201, (11th Cir. 2008) (citing *Bryant Woods Inn*, 124 F.3d at 604 ("In determining whether the reasonableness requirement has been met, a court may consider . . . the extent to which the accommodation would undermine the legitimate purposes and effects of existing zoning regulations.")).

In *Hovsons*, the township-defendant had zoning which excluded nursing homes from all fifteen residential zones, but authorized "nursing home construction within its hospital support

zone, an area zoned for hospitals and other medical support facilities." 89 F.3d at 1104. The Third Circuit "reject[ed] the [township-defendant's] contention that nursing homes are fundamentally incompatible with the other permitted uses in the [residential district]" and held that the township-defendant failed to reasonably "accommodate the elderly disabled who are in need of nursing home care and desire to live in one of the [t]ownship's residential zones." *Id.* at 1105–06. Whereas in *Lapid-Laurel*, the Third Circuit found the township-defendant's objections regarding traffic safety and emergency vehicle access were sufficient reasons to deny the developer-plaintiff's application and therefore the township did not fail to reasonably accommodate the developer-plaintiff's proposed 95-bed senior citizen care facility. 284 F.3d at 462–66.

Here, the Resolution identified several reasonable reasons for the Board's denial including: (1) "substantial detriment to the zone plan, zoning ordinance, and the surrounding area"; (2) traffic; (3) "ingress, and egress to and from the [P]roperty"; (4) noise intensification; (5) "height variances that were inconsistent with the Master Plan and zone plan thereby rending the proposed facility out of character for the site"; (6) "[t]he structure would appear in excess of 60 feet in height at certain points due to varied grading"; and (7) "[t]he ambitious landscaping proposed will not acceptably provide screening for at least ten years." (ECF No. 76-2 ¶ 36; ECF No. 77-3 ¶¶ 42–43.) However, the Property is adjacent to an existing nursing facility that is located in the R-BB District and to the north of the Plainfield Country Club, indicating that the construction of an assisted living facility in the R-A District may be reasonable. (ECF No. 78-3 ¶¶ 10–12; ECF No. 78-29 ¶¶ 10–12.) ECF No. 78-32 ¶¶ 10–12.) Therefore, the Court finds an issue of material fact remains as to whether Defendants have demonstrated Plaintiffs' requested accommodations were unreasonable and constitute a fundamental alteration. *See Hovsons*, 89 F.3d at 1105 (holding nursing home was not a fundamental alteration of the residential zone at issue because the proposed nursing home

was "similar to that of the local planned residential retirement communities, a permitted use in the [residential zone]"); *see also Oxford House, Inc. v. Cherry Hill*, 799 F. Supp. 450, 462 (D.N.J. 1992) ("hold[ing] that defendant did not meet its burden of establish[ing] that no less restrictive alternative was available or that no reasonable accommodation could be made" for a sober house because the proposed-property, located in a residential zone, was "surrounded by offices, apartment buildings and duplexes").

Accordingly, Defendants' Motions seeking summary judgment on Count Two are **DENIED**.

### C.    Violations of Title II of the ADA and the Rehabilitation Act (Counts Three and Four)

The Rehabilitation Act provides that no disabled individual "shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The ADA expands the scope of the Rehabilitation Act to private entities receiving federal funds. *901 Ernston Rd., LLC v. Borough of Sayreville Zoning Bd. of Adjustment*, Civ. A. No. 18-2442, 2018 WL 2176175, at *5–6 (D.N.J. May 11, 2018) (citing *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 302 (3d Cir. 2007)). Both the Rehabilitation Act and the ADA "require reasonable accommodations be made if necessary for an equal opportunity to receive benefits from, or participate in, programs run by [public entities or private entities receiving federal funds]." *Lapid Ventures, LLC v. Twp. of Piscataway*, Civ. A. No. 10-6219, 2011 WL 2429314, at *5 (D.N.J. June 13, 2011).

The parties did not submit briefing in support of their motions seeking summary judgment on Counts Three and Four. Instead, the parties relied on their arguments related to Counts One and Two and noted that Courts have applied the same analysis to claims under the FHAA, the ADA,

and the Rehabilitation Act. The Court agrees with the parties' assertions. *See id.* ("Since the requirements of the FHAA, [the] ADA and [the] Rehabilitation Act are essentially the same, courts have concluded that the FHAA analysis can be applied to [the] ADA and [the] Rehabilitation Act claims as well in such cases where claims are brought under all three statutes." (citing *Reg'l Econ. Cmty. Action Program v. City of Middletown,* 294 F.3d 35, 45–46 (2d Cir. 2002)); *see also Yates Real Est.,* 404 F. Supp. 3d at 914 (analyzing the FHAA, the Rehabilitation Act, and the ADA claims under the requirements and framework of the FHAA). As the Court has denied the parties' respective motions seeking summary judgment on Plaintiffs' claim for reasonable accommodations (Count Two), Section III.B., *supra*, the Court also denies the parties' motions seeking summary judgment on Counts Three and Four.

### D.    Violation of § 1983 – Equal Protection (Count Five)

The Township asserts it has not violated Plaintiffs' equal protection rights under § 1983. (ECF No. 77-2 at 24–26.) The Township argues Plaintiffs have failed to show evidence of governmental action that "shocks the conscience." (*Id.* at 24.) Further, the Township contends Plaintiffs have not established "they were the target of intentional, purposeful discrimination by the Township based on their protected class." (*Id.* at 25.) The Board "in large part relies upon the arguments set forth by the Township." (ECF No. 76-3 at 14.) The Board also submits "[t]he record before the Board has been argued and summarized extensively and nowhere therein can it be indicated that the Board would have been opposed to the project other than it failed to fit into the character of the neighborhood." (*Id.* at 14–15.)

In their opposition brief, Plaintiffs do not respond to these arguments. (*See* ECF No. 76-10.) Indeed, Plaintiffs' opposition does not even mention their § 1983 claim. (*See id.*) Further, Plaintiffs' brief in support of their motion for summary judgment does not raise arguments as to

why they are entitled to judgment in their favor on Count Five. (*See* ECF No. 78-2.)

It is not the Court's responsibility to sift through the record to find evidence and make arguments supporting Plaintiffs' position. *See DeShields v. Int'l Resort Props. Ltd.*, 463 F. App'x 117, 120 (3d Cir. 2012) (noting that "judges are not like pigs, hunting for truffles buried in briefs" (internal citation and quotation marks omitted)). Therefore, the Court finds that Plaintiffs have abandoned their § 1983 claim raised in Count Five. *See Brenner v. Twp. of Moorestown*, Civ. A. No. 09-219, 2011 WL 1882394, at *11 (D.N.J. May 17, 2011) (explaining that "a plaintiff's failure to respond to the defendant's arguments on summary judgment constitutes an abandonment of these causes of action and essentially acts as a waiver of these issues" (quoting *Skirpan v. Pinnacle Health Hosps.*, Civ. A. No. 07-1703, 2010 WL 3632536, at *6 (M.D. Pa. April 21, 2010) (internal quotation marks omitted)); *see also Desyatnik v. Atl. Casting & Eng'g Corp.*, Civ. A. No 3-5441, 2006 WL 120163, *1 (D.N.J. Jan. 17, 2006) ("[W]hen a party fails to offer any argument . . . in opposition to . . . [a] motion for summary judgment, such claims . . . have been abandoned." (internal citation and quotation marks omitted)); *Bernard v. Webb-McRae*, Civ A. No. 17-7030, 2020 WL 1329934, at *2 (D.N.J. Mar. 23, 2020) (granting defendants' motion for summary judgment on plaintiff's § 1983 claim because plaintiff did not respond to defendants' arguments and failed to mention his § 1983 claim in his opposition brief).

Accordingly, Defendants' motions seeking summary judgment on Plaintiffs' § 1983 claim (Count Five) are **GRANTED**. To the extent Plaintiffs seeks summary judgment on their § 1983 claim (Count Five), Plaintiffs' motion is **DENIED**.

**IV.**    **CONCLUSION**

For the reasons set forth above, the Board's Motion for Summary Judgment (ECF No. 76)

is **GRANTED IN PART and DENIED IN PART**, the Township's Motion for Summary

Judgment (ECF No. 77) is **GRANTED IN PART and DENIED IN PART**, and Plaintiffs' Motion

for Summary Judgment (ECF No. 78) is **GRANTED IN PART and DENIED IN PART**. An

appropriate Order follows.

/s/ Brian R. Martinotti
**HON. BRIAN R. MARTINOTTI**
**UNITED STATES DISTRICT JUDGE**

Dated:  March 27, 2024